O. H. MOBERLY, as Commissioner of Finance in Charge of the Assets and Affairs of the COOPER COUNTY STATE BANK of Bunceton, a Corporation, Appellants, v. N. NELSON LEONARD, ARTHUR BLOMQUIST, SNODE MORRIS, H. L. TWILLMAN, GEORGE K. CRAWFORD, GEORGE A. CARPENTER and ARTHUR W. NELSON, JR., as Administrator of the Estate of ARTHUR W. NELSON, Defendants.—99 S. W. (2d) 58.

Division One, November 12, 1936.

*Roy D. Williams, W. W. Carpenter, Jr.,* and *L. O. Schaumburg* for appellants.

*Clark, Boggs, Peterson & Becker, Pendleton & Martin, John Windsor, Hampton Tisdale* and *Montgomery, Martin & Montgomery* for respondents.

HYDE, C.—This is an action at law on a contract, brought on behalf of plaintiff banks, in liquidation. The contract was made in connection with the transfer of the assets and assumption of the liabilities of another bank in 1928. The court sustained defendants' separate demurrers to plaintiffs' petition, which set up the grounds that it failed to state a cause of action, and that it showed plaintiffs to have no right "to sue upon the alleged cause of action therein." Plaintiffs declined to plead further and from the judgment entered for defendants, plaintiffs appealed.

The material facts hereinafter stated were alleged in plaintiffs' petition. Prior to April 25, 1928, there were two banks in business in the town of Bunceton. These were the Bank of Bunceton, hereinafter called the Bunceton Bank, and the Cooper County Bank, hereinafter referred to as the County Bank. On that date, the newly organized Cooper County State Bank commenced business. We will refer to it as the State Bank. On that date also, the two old banks ceased business and their assets were transferred to the State Bank under the circumstances and pursuant to the contracts described in the petition.

These transactions were stated to be, as follows:

First: The Bunceton Bank made a contract with the County Bank ("because, as the result of the examination of the assets of said Bank of Bunceton, the then Commissioner of Finance of the State of Missouri deemed it a public advantage to the stockholders of said Bank of Bunceton, that said contract be entered into"), which provided that the County Bank "should assume and agree to pay and did thereby assume . . . all amounts due from said Bank of Bunceton to its depositors and all the other creditors" except to its stockholders and a certain $20,000 liability under a "guarantee or trust agreement;" and that "said Bank of Bunceton should transfer to said Cooper County Bank or its successors and assigns, all of its property and assets of record on its books as of the 25th day of April, 1928, which said assets of said Bank of Bunceton, during the period intervening between April 25, 1928, and April 25, 1931, said Cooper County Bank, and its successors and assigns, *should undertake to collect and convert into cash,* and . . . *should retain out of such proceeds an amount equal* to the amount of the aforesaid *liabilities* of the Bank of Bunceton *assumed* by it as aforesaid."

Second: "At the time of the delivery" of the Bunceton Bank's contract with the County Bank to it, the latter made a contract with the State Bank (likewise "because as the result of the examination of the assets of said Cooper County Bank, the then Commissioner of Finance of the State of Missouri, deemed it a public advantage and an advantage to the stockholders of said Cooper County Bank that said contract be entered into"), which provided that the State Bank "should assume and agree to pay and did thereby assume and thereafter did pay all amounts due from said Cooper County Bank to its depositors and all the other creditors" except to its stockholders; and that "said Cooper County Bank should transfer to said Cooper County State Bank all of its property and assets of record on its books as of the 25th day of April, 1928, which said assets of said Cooper County Bank during the period intervening between April 25, 1928, and April 25, 1930, said Cooper County State Bank should undertake to collect and convert into cash, and should retain out of such proceeds as amount equal to the amount of the aforesaid liabilities of the Cooper County Bank assumed by it as aforesaid."

Third: The defendants, and two others now deceased, "by their contract dated April 17, 1928, and delivered April 25, 1928, to the County Bank as inducement and part consideration for the County Bank's execution of the contract for the Bunceton Bank's assets "jointly and severally promised and agreed to pay on demand to the Cooper County Bank, of Bunceton, Missouri, and its successors and assigns, any deficiency between the amount of the liabilities of the Bank of Bunceton so assumed as aforesaid by said Cooper County Bank, and its successors and assigns, plus interest, attorneys' fees, court costs and expenses aforesaid, and the amount said Cooper Coun-

ty Bank and its successors and assigns should realize in cash from the aforesaid former assets of the Bank of Bunceton during the three years next following April 25, 1928.'' (For convenient reference we state the actual language of this contract, as follows: ''We . . . promise to pay . . . a sufficient amount to equal the difference between the assets assigned to said Cooper County Bank . . . and the liabilities assumed by it, providing such assets are not liquidated in sufficient amount to meet such liabilities on or before the 25th day of April, 1931.'')

Fourth: The same individuals also on April 25, 1928, made a supplemental contract with the County Bank, which provided that ''during the period intervening between April 25, 1928, and April 25, 1931, certain of the property received by said banks from said Bank of Bunceton, equaling the liabilities assumed by them, should yield said Cooper County Bank, or its successors and assigns, an income of not less than six per cent per annum during each ninety days period, such ninety day periods to be reckoned from April 25, 1928, and, in the event such property failed to do so, any such deficiency'' would be paid by them.

Fifth: ''All of the said aforesaid contracts were delivered concurrently and as one transaction on or about April 25, 1928;'' and ''it was at that time understood and verbally agreed . . . that said Cooper County State Bank should be the successor of said Cooper County Bank, and as such, should do and perform all the duties and obligations imposed by the aforesaid contracts on said Cooper County Bank, and as such successor should succeed to each and all the rights, privileges and benefits provided for said Cooper County Bank in said contracts, to all of which the then Commissioner of Finance of the State of Missouri gave his consent and approval.''

Sixth: ''The assets of said Bank of Bunceton were transferred and delivered to plaintiff, Cooper County State Bank, and said plaintiff, out of its own assets, paid or discharged all the deposit liabilities of said Bank of Bunceton and all other debts of said Bank of Bunceton assumed by the Cooper County Bank.'' It is also stated that the County Bank ''did cause'' these debts and liabilities to be paid.

The demurrers must be ruled upon the language of the petition rather than the language of the contracts because none of the contracts referred to, and none of the provisions thereof, are set out *in haec verba* in the petition. The petition attempts only to state the substance of or the pleaders' construction of the provisions stated. [For further information see Hockenberry v. Cooper County State Bank, 338 Mo. 31, 88 S. W. (2d) 1031.]

No settlement was made during the three-year period, but on April 27, 1931, a contract was made by the Bunceton Bank with the County Bank and the State Bank, by which ''it was agreed between the parties thereto that there then remained due to said Cooper County

Bank and its successors and assigns, and/or the plaintiff, Cooper County State Bank, and its successors and assigns, so far as then ascertained, the sum of eighty-two thousand three hundred sixteen and 81/100 dollars ($82,316.81), under and by virtue of the contracts hereinbefore pleaded; that the time for the collection and conversion into cash of the assets of the Bank of Bunceton and time for final settlement under the contract . . . should be extended to April 25, 1932; and that all said previous actions by said Cooper County Bank and plaintiff, Cooper County State Bank, under all of the aforesaid contracts, were thereby ratified, confirmed and approved." On the same date, another contract was made by the individual parties (defendants here) to the contract dated April 17, 1928, with the County Bank and the State Bank, in which it was "agreed that on the 25th day of April, 1931, there remained due by them to said Cooper County Bank, or to plaintiff, Cooper County State Bank, so far as then ascertained, the sum of eighty-two thousand three hundred sixteen and 81/100 ($82,316.81) dollars in cash, under and by virtue of the aforesaid agreements, *although all of the assets of said Bank of Bunceton had not been converted into cash;* and that . . . the time in which all of the aforesaid contracts described as having been entered into in April, 1928, and delivered on April 25, 1928, should be fulfilled, should be extended to April 25, 1932; that in the meantime said Cooper County Bank or said plaintiff, Cooper County State Bank, its successors and assigns, should continue to collect and cause to be converted into cash as far as practicable, the remainder of the former assets of said Bank of Bunceton upon the said terms and conditions hereinbefore described; and that final and complete settlement under said last-mentioned contract and all of the aforesaid contracts should be made on or before April 25, 1932." In June, 1932, the State Bank was placed in the hands of the Commissioner of Finance for liquidation, without a final settlement having been made.

It is further stated that "after allowing credit for all sums realized in cash from all of the aforesaid assets of the Bank of Bunceton as of April 25, 1928, so transferred by said Bank of Bunceton to either said Cooper County Bank or plaintiff, Cooper County State Bank, under and by virtue of all of the aforesaid contracts, there remained due to plaintiff, on the 25th day of April, 1932, the sum of eighty-four thousand six hundred seven and 44/100 ($84,607.44) dollars, *the same being the difference between the amount recovered* by said Cooper County Bank and said Cooper County State Bank *out of the assets obtained* by them or either of them from said Bank of Bunceton, which were assumed by said Cooper County Bank and said Cooper County State Bank *and (amount) paid by plaintiff,* Cooper County State Bank, plus court costs, attorneys' fees and other expenses incurred *in accordance with the terms of the aforesaid contracts;* and

*that since April 25, 1932, plaintiffs have further collected* the further total sum of five hundred seventy-five and 14/100 ($575.14) dollars *on the aforesaid former assets of said Bank of Bunceton,* thus leaving due the plaintiffs herein, by virtue of the aforesaid contracts the principal sum of eighty-four thousand thirty-two and 31/100 ($84,-032.31) dollars, plus interest thereon from April 25, 1932, at the rate of 6% per annum.''

It is contended by defendants that the contract made by defendants was a contract of indemnity; that it required all of the assets of the Bunceton Bank to be converted into cash within ·the period (originally three years and extended to four years) provided therein; and that the petition shows on its face that no cause of action on this indemnity contract had accrued because it shows that the liquidation of these assets was not completed within such time and had never been completed. We hold that the contract signed by defendants was a contract of indemnity, whether considered on its actual wording or its substance as set out in the petition. (Both seem to be intended to mean the same.) It certainly was not a guaranty of the payment of each and every note transferred (as might have been required), and, since it contained no agreement to repurchase any of the assets sold, if part of these assets were real estate (it is not alleged what they were, but see Hockenberry case, supra) the contract as to loss in liquidation of such assets could only be one of indemnity. What defendants agreed to pay was *the difference between the total amount of debts of the Bunceton Bank* which were paid to its depositors and other creditors on and after April 25, 1928, *and the amount which could be realized in cash from the assets of the Bunceton Bank.* Clearly that is a contract of indemnity. [Wahl v. Cunningham, 320 Mo. 57, 64, 6 S. W. (2d) 576, Id., 332 Mo. 21, 56 S. W. (2d) 1052; Chase National Bank v. Fidelity & Deposit Co., 79 Fed. (2d) 84; State-Planters' Bank & Trust Co. v. First National Bank, 76 Fed. (2d) 527; Niagara Share Corp. v. Fried, 61 Fed. (2d) 740; Green v. Newmark (Cal.), 28 Pac. 395; Caldwell v. McKenna (Idaho), 33 Pac. (2d) 366; In re Prunty's Estate (Iowa), 207 N. W. 785; Commonwealth ex rel. Wilson v. La Grange Bank & Trust Co. (Ky.), 65 S. W. (2d) 65; Bank of Blaine v. Hanshaw (Ky.), 75 S. W. (2d) 529; Westville Land Co. v. Handle (N. J.), 171 Atl. 520; Assets Realization Co. v. Roth (N. Y.), 123 N. E. 743; Assets Realization Co. v. Howard (N. Y.), 105 N. E. 680; Lehr v. Melton (Okla.), 44 Pac. (2d) 111; First National Bank of Spring Mills v. Walker (Pa.), 137 Atl. 257; Olson v. Smith (Tex.), 72 S. W. (2d) 650; Kramer v. Linz (Tex.), 73 S. W. (2d) 648; Washam v. Wood (Wash.), 31 Pac. (2d) 508.]

However, the terms and conditions of this contract are not so clear. How was the amount which defendants must pay (if collections, within the time provided, did not equal debts) to be ascertained? Was

it intended that all assets, which had not been converted into cash during the three-year period (or four years as extended), should be sold at public auction before the day of settlement? (That is the contention made in defendants' brief.) Or were defendants to pay the full face value of all assets remaining uncollected on settlement day regardless of their actual value? (As seems to be contended in the other side's brief.) Or was the actual value of uncollected assets to be reached by appraisement and together with the total of all collections to be deducted therefrom in order to determine the amount due? Or if valuable assets remained uncollected did plaintiffs have the right to continue the liquidation beyond the four-year period? It is especially difficult (if not impossible) to determine these questions from what is so briefly stated in the petition about the terms if the original and renewal contracts, and without having the actual terms of these contracts before us. Any of these methods might have been provided, but can we say which one was provided, or rather does the petition show what method was to be used? If defendants were to pay the full face value of the uncollected assets at the end of the four-year period, then were defendants to be paid what was thereafter collected from these assets and who was to continue collection? Since the banks and the Finance Commissioner were apparently acting under the authority of what is now Section 5379, Revised Statutes 1929, the transaction was an outright sale of most of the assets transferred. (At least all except those equal to the amount of capital stock and other liabilities not assumed.) If these assets were so sold, what right would defendants have to them or anything collected therefrom? The contract made no requirement or provision for defendants to repurchase the assets sold.

Even though we cannot determine from the petition what method of fixing the amount of loss was intended, we do think it is clear that the loss was to be determined by a completion of the liquidation of the Bunceton Bank assets in some reasonable manner before defendants were to be required to settle on their contract of indemnity. Surely, it was a completed liquidation to determine the ultimate loss that was contemplated by all. ''Loss resulting from the advances was the risk that was in view; protection against such loss the controlling purpose of the bond. The moment advances were made, the risk had been incurred, and the duty to indemnify arose. Liquidation was not the act on which the right to indemnity was to depend. Liquidation was merely the means by which the measure of the loss was to be gauged. The agencies of liquidation were defined during the liquidator's life. (The liquidator was a bank which failed and liquidation was completed by a receiver.) They were not defined after its death. They might therefore be any agencies appropriate in that contingency for the ascertainment of the loss. The death of

the liquidator did not wipe out the advances, and business men cannot have expected it to wipe out the covenant. If loss could not be ascertained in one way, it would have to be ascertained in another. The last thing they can have expected was that it would not be ascertained at all." [Justice Cardozo in Assets Realization Co. v. Roth, 123 N. E. l. c. 744-745.]

There are two kinds of indemnity contracts; indemnity against liability, and indemnity against loss. " 'Where the indemnity is against liability, the cause of action is complete and the indemnitee may recover upon the contract as soon as his liability has become fixed and established even though he has sustained no actual loss or damage at the time he seeks to recover.' [31 C. J. 438, sec. 33.] 'Where the contract is not a mere contract to indemnify and save harmless, but a contract to save from a legal liability or claim, the legal liability incurred and not the actual damage sustained is the measure of damage.' [31 C. J. 435, sec. 28.] " State-Planters' Bank & Trust Co. v. First National Bank, 76 Fed. (2d) 527, certiorari denied 295 U. S. 764, 55 Sup. Ct. 923, 79 L. Ed. 1706.] "There is a breach of the covenant and the indemnitee's right of recovery accrues as soon as he has suffered the loss or damage against which he was to be saved harmless;" and "where the contract is strictly one of indemnity . . . against loss or damages, the indemnitee cannot recover until he has . . . suffered an actual loss or damage against which the covenant runs." [31 C. J. 438, sec. 32, and 439, sec. 35.] "A promise to indemnify against the existence of a liability is broken as soon as the liability is incurred, and the promisee is entitled to recover damages based on the amount of his liability although he has not satisfied it. On the other hand, a promisor who has undertaken merely to indemnify against damage is liable only when actual payment has been made by the promisee, or damage suffered by him; and then only to the extent of such payment or damage." [3 Williston on Contracts, 2501, sec. 1409.] An indemnitee might be entitled to maintain a suit sooner, where as in Wahl v. Cunningham, supra, it was alleged that the indemnitors " 'advised this plaintiff that they were not liable thereon and would not pay said obligation at this time, nor when the Pemiscot County Bank's affairs were finally wound up and the total amount ascertained to be due plaintiff.' " Nothing like that is alleged in the petition before us. [As to equitable relief before loss see 31 C. J. 441, sec. 37.]

If, therefore, this contract is indemnity against liability, it is not necessary to show the actual loss in order to recover, but if it is indemnity against loss then the loss must be shown to have actually been sustained. The contract in this case could not be a contract of indemnity against liability because it is stated that all of the debts of the Bunceton Bank were paid by the State Bank at the beginning of the transaction. No one could thereafter become

liable for these debts (because they went out of existence). but if the assets received did not pay out a loss would be sustained. "Loss resulting from the advances was the risk that was in view." Therefore, this contract was a contract of indemnity against the loss which would result in case this money, paid out to depositors and creditors, could not be recovered by liquidating the assets received.

The petition, however, seems to proceed on the theory similar to that of indemnity against liability rather than indemnity against loss. The suit is for what would be lost, if nothing more was to be realized, and not an actual determined loss. It assumes that when the four-year period ended, defendants then owed the State Bank the difference between the total amount of the debts of the Bunceton Bank to depositors and creditors, paid by the State Bank, and the total amount of collections made up to that time from its assets (on the indemnity contract); plus the amount necessary to make six per cent interest on the same throughout that period (on the supplemental contract); that is, the whole face value of the remaining assets taken over regardless of their actual value, and an additional amount for interest. The loss could not be that much unless all remaining assets were wholly worthless. The petition makes no tender of these uncollected assets to defendants and offers no credit for their actual value. Certainly the State Bank would not be entitled to recover this entire amount of the face value of the uncollected assets from defendants and then keep all these remaining assets as well. Of course, if they were absolutely worthless, failure to tender might make no difference. The petition does not so state, but on the contrary, it states that further collections have been made and retained by the bank from these assets, since the end of the liquidation period. The petition does not state that the actual loss or damage has been ascertained by any method and in fact shows that it has not been determined. It might be inferred that the State Bank had sustained some loss, since it had closed, but this loss (or most of it) might have come from the assets taken over from the County Bank or from its own operations of more than four years. Whether there will be a loss from the Bunceton Bank's assets, and if so how much, is left entirely to conjecture. The petition does not state that there will be a loss but says only that all of its assets have not been collected. It does not say that they cannot be collected and it does not show what efforts were made to collect. Its fatal defect, therefore, is that it shows that suit was commenced before a cause of action on the contract accrued.

A case in point is Commonwealth ex rel. Wilson v. La Grange Bank & Trust Co. (Ky.), 65 S. W. (2d) 65. There a bank was organized to take over the assets of two existing banks. The new bank assumed and paid all obligations of the old banks except capital stock liability. "The contract provided that the new bank was to

make diligent effort to reimburse itself for the liabilities it had assumed out of the assets which had been transferred to it, and that, after it had realized a sufficient amount from such assets to reimburse itself for the liabilities it had assumed, it would turn over to the two older banks, respectively, any excess... The contract further provided that 'in the event the assets of either' of the two old banks 'when collected or liquidated do not realize a sufficient amount to pay off or reimburse' the new bank 'in full the payment of the liabilities assumed,' then the two old banks 'as their interests appear will reimburse' the new bank." The amount of loss for which the old banks were to be liable was limited and it was provided that the new bank should make no claim against the old after two years. Within that time the new bank was closed and suit was thereafter brought by the Banking Commissioner liquidating the new bank. When the new bank closed "the board of directors of the new bank adopted a resolution reciting that there was an apparent deficit in the amount due the new bank from the old banks because of the probable insufficiency of the assets received from the old banks to take care of the liabilities assumed and paid by the new bank for the old banks," and ordered suit but stated that "it was impossible at that time to determine the exact amount of the said deficit." The petition further showed "that the new bank has yet on hand assets of the two older banks which it is alleged are frozen."

The Court of Appeals held that a demurrer was properly sustained, saying:

"This contract, it is true, obligated the two old banks to reimburse the new bank for any deficiency of assets transferred. But such liability under the contract was not to accrue until the assets transferred had been liquidated and it had been found that the proceeds were not sufficient to discharge the liabilities assumed. . . . The old banks only obligated themselves to pay off any deficit that might exist after the assets transferred to the new bank had been liquidated. Not until then were either of the old banks obligated by the contract to pay a penny. Since the conditions under which the old banks might owe the new bank anything have not been met, the new bank has no claim against the old banks."

Other cases herein cited illustrative of the same principle are State-Planters' Bank & Trust Co. v. First National Bank, 76 Fed. (2d) 527, and Caldwell v. McKenna, 33 Pac. (2d) 366, where the amount of the loss on the assets taken over from old banks had been definitely determined by a judgment before suit was brought against the indemnitors. In the former case, there was indemnity against both liability and loss, but the amount of loss had been fixed by a judgment against the old bank. In the latter case there was a judgment against the makers of a note, given as security by the indemnitors, and one of them had paid it. Such judgments were binding upon the in-

demnitors as to the amount of loss and could not be collaterally attacked by them. Therefore, the cause of action had accrued in those cases because after complete liquidation the loss had been definitely settled. It will be noted, in the Caldwell case, it was held that the cause of action did not accrue, so as to start the Statute of Limitations to run against it, at the end of the original time set for payment, but that it only accrued when the loss was paid, after it had been definitely determined, more than three years later. A somewhat similar case is In re Prunty's Estate, 207 N. W. 785, where liability for indemnity was limited in amount, but in which a loss of a greater amount than the contract provided for was shown on two farms, on which there was a complete loss of the bank's whole investment, because of prior mortgages, and which it had been recognized by being charged off its books.

■ There seems to be no good reason why the Commissioner of Finance could not have, in this case immediately upon taking charge of the State Bank, followed the procedure for determining the loss, approved by Justice Cardozo in Assets Realization Co. v. Roth, 123 N. E. 743, before commencing this suit. Perhaps conditions are such that this could yet be done. Knowing what we do (judicially and otherwise) about the times during the one-year extension of the original liquidation period, we doubt if proof for the defense made in Green v. Newmark, 28 Pac. (2d) 395, would have been available to defendants, because it does not seem likely that they could have been damaged by failure to sell out everything during that time. We hold that the trial court properly sustained the demurrers herein because it appears from the petition that this suit was prematurely brought. We will not pass upon the question of the assignability of defendants' contracts with the County Bank, as described in the petition (see 31 C. J. 446, sec. 45, for general principles) or other questions raised, because it appears, from a comparison of the allegations of the petition, the record in the Hockenberry case, and the exhibits filed herein, that we would be deciding a moot case. [See Fugel v. Becker (Mo.), 2 S. W. (2d) 743; Ludwig v. Scott (Mo.), 65 S. W. (2d) 1034; State ex rel. Myers v. Shinnick (Mo.), 19 S. W. (2d) 676.] Such questions can be considered if and when they are subsequently presented in a case in which they are essential to a determination of the rights of the parties.

The judgment is affirmed. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All the judges concur.